Opinion issued August 3, 2017



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00979-CR

———————————

## MILTON ROLANDO PAZ, Appellant

## V.

## THE STATE OF TEXAS, Appellee

On Appeal from the 351st District Court
Harris County, Texas
Trial Court Case No. 1296569

## O P I N I O N

The State charged Appellant, Milton Rolando Paz, with capital murder.[1]

Appellant pleaded not guilty. The jury found him guilty, and an automatic life

---

[1]  *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011), § 19.03(a)(8) (West Supp. 2016).

sentence was assessed. In three issues on appeal, Appellant argues (1) the trial court abused its discretion by denying his motion to suppress; (2) he suffered egregious harm when the trial court failed to *sua sponte* include a jury instruction on voluntariness; and (3) the trial court abused its discretion by admitting certain autopsy photographs.

We reverse and remand.

## Background

In February 2011, Appellant was the father to two young children, a thirteen-month-old girl and a one-month-old girl. During that month, Appellant's wife had to leave town for work. A friend agreed to care for the infant while the wife was away. The wife's work trip got extended. The friend caring for the infant had to return her to Appellant because the friend also had to go out of town. The infant was in good health when returned to Appellant's care other than an upset stomach. Appellant was bothered that he had to care for his infant daughter.

When the friend returned, she drove by Appellant's house to see if Appellant's wife had returned. She saw several men drinking on Appellant's patio but did not see Appellant or his wife.

The next day, Appellant called his wife. He told her the infant was dead, describing her as cold and purple. The wife told him to call 911. Appellant called

2

911, and an ambulance arrived. The infant was taken to the hospital but could not be revived.

The infant had bite marks on her cheeks and extensive bruising across her body, both internal and external. Each of her limbs were fractured. Four ribs were fractured. She had multiple, severe fractures on her skull with hemorrhaging around her skull, brain, and optic nerves. A medical examiner later testified that the skull fractures and hemorrhaging played the primary role in the infant's death.

Lieutenant O. Chandler and Sergeant R. Figueroa first encountered Appellant at the hospital when the medical staff was attempting to revive his daughter. They spoke with Appellant for about 30 minutes, when Appellant agreed to go with them to his apartment. Appellant allowed them to search his apartment. Afterwards, Appellant agreed to go with the officers to the police station. Lieutenant Chandler drove him to the police station. While there, police photographed Appellant. The officers then took Appellant to a holding facility.

The next day, Lieutenant Chandler and Sergeant Figueroa removed Appellant from the holding facility, and a patrol officer transported him back to the police station. They transferred Appellant to Officer R. Montoya and watched the interaction in another room.

Appellant spoke with Officer Montoya and agreed to provide a voluntary statement. Their conversation was recorded. Near the beginning of the four-hour

3

conversation, Appellant told Officer Montoya that Sergeant Figueroa had called him a "fucking ho." Then the following exchange occurred:

> [Appellant]: And then later I was handcuffed for no reason. And then the guy came at me like this {demonstrating}, you know, as if he wanted to hit me.
>
> [Montoya]: Uh-huh.
>
> [Appellant]: Thi -- this dude that was [there] right now . . . .
>
> [Montoya]: Uh-huh.
>
> [Appellant]: And then he says to me, "Do you want trouble with me? Do you want trouble?" And he got in my face. So I said "No" to him. Then I was handcuffed and put in the can, in jail.

Officer Montoya followed this up by asking Appellant if he knew why he was being investigated. Appellant acknowledged that it was because he was the only one with the girls at the time of his infant daughter's death. Officer Montoya then asked Appellant if he wanted to voluntarily discuss what happened with him. Appellant said yes and discussed another way in which he had cooperated with the investigators to aid the investigation.

During the conversation, Officer Montoya described the process of taking a polygraph test. Officer Montoya talked about people trying and failing to lie and cheat during the test.

> [Montoya]: What- what is the investigator going to say if I say, "Look, so-and-so came to cheat and to do tricks on the- on the test."
>
> [Appellant]: Uh-huh.

4

[Montoya]: The investigator, he or she is going to imagine the worst, right?

[Appellant]: They will beat him up.

[Montoya]: No, because we already know that people come to cheat and trick or fraud—

[Appellant]: Uh-huh.

[Montoya]: . . . because they're only lying.

[Appellant]: I'm think they- because over there they tell me they wanted to beat me up for not wanting to talk. Can you imagine if someone throws me in there and I get beat up . . . .

About three hours into the conversation, Appellant took a polygraph test. As Officer Montoya began the test, Appellant told him, "You're really good people. I have more trust in seeing you than . . . . I'm saying that you're the only trustworthy person that I've seen for a while. That's why I trust you."

Officer Montoya had some difficulty getting Appellant to follow the instructions for the polygraph test. The following exchange occurred:

[Montoya]: I'm going to tell you something and I'm going to say it really sincerely. And ta- don't take it as me scolding you, but take it the right way.

[Appellant]: Okay.

[Montoya]: If the investigat- investigators[2] see this video right now. . . it's enough. It's enough evidence for them to see that you are not co-operating.

---

[2] Both Appellant and Officer Montoya used the term "investigators" to refer to Lieutenant Chandler and Sergeant Figueroa.

5

[Appellant]: No, I'm just—

[Montoya]:  I just need to go out right now and make the call and tell them, he's not co-operating. . .

[Appellant]: Okay.

[Montoya]:  . . . and you already know what they're going to do with you.

[Appellant]: Yes.

[Montoya]:  Okay?

[Appellant]: I apologize.

[Montoya]:  No-no-no.  You keep telling me the same thing: "Forgive me. I'm sorry."

[Appellant]: Yes.

After a short break, Appellant continued to argue that he had not hurt his infant daughter.

[Appellant]: That's what I did and --

[Montoya]:  You want --

[Appellant]: . . . I remember all of that well.

[Montoya]:  Okay. Okay.

[Appellant]: I got up, I laid her down --

[Montoya]:  Okay, Milton. You want me to go out right now and give them --

[Appellant]: How are you going to tell me that I hit her --

[Montoya]:  Wait. Let me talk. Milton.

6

[Appellant]: . . . if I didn't hit her. Understand me.

[Montoya]: Milton, calm down. Calm down. We're men.

[Appellant]: Yes, but I didn't {unintelligible}.

[Montoya]: We're men. Calm down, Milton. Let me talk. Listen to me. It's very important that I want you to listen to me. It's very important, listen to me. Look, Milton. I go out there right now, and I tell these investigators that you . . . don't care. You don't want to explain anything. Do you know what they are going to imagine about you? That you're an animal. . . .

Shortly after that, Appellant took the polygraph test. After the test, Officer Montoya told Appellant he had failed the test and encouraged Appellant to be honest with him about what had really happened. Over the course of the remaining conversation, Appellant admitted to trying to forcefully feed the baby her bottle and shaking her. Appellant admitted that he threw the baby onto the bed, that the baby hit the headboard in the process, that he saw something red that could have been blood, and that he did not investigate further.

At the end of the questioning, Appellant and Officer Montoya referred to each other as "brother." Appellant ended the conversation saying, "Thank you for everything, man."

The State charged Appellant with capital murder. Appellant filed a motion to suppress. He argued that his statement to Officer Montoya should be suppressed because his statement was not voluntary.

7

Appellant testified at the hearing on the motion to suppress. During his testimony, he repeated his claims that Sergeant Figueroa had called him a derogatory name and lunged at him as if Figueroa were going to punch him. He also claimed that, when Lieutenant Chandler and Sergeant Figueroa transported him from the holding facility to the police station, Sergeant Figueroa slapped him while buckling him in the police car. Appellant argued that the derogatory statement, the threatening gesture, the slap, and Officer Montoya's statement that Appellant knew what "they're going to do with" him was enough to overcome his will and render his statement involuntary.

Lieutenant Chandler and Sergeant Figueroa also testified at the hearing. Sergeant Figueroa denied calling Appellant a derogatory name, lunging at him, and slapping him. Lieutenant Chandler denied seeing any of the alleged acts.

The trial court issued findings of fact and conclusions of law. The trial court found Lieutenant Chandler and Sergeant Figueroa credible and Appellant not credible. The trial court determined that the alleged acts by Sergeant Figueroa did not occur and concluded that Appellant's statement was voluntary.

The trial court admitted Appellant's statement during trial. The conversation between Officer Montoya and Appellant was read to the jury.

The State also called A. Lopez to testify at trial. Lopez is a medical examiner. She testified about the injuries the infant sustained and the infant's cause of death.

Certain autopsy photographs were admitted at trial. Many of the autopsy photographs show the external injuries inflicted on the infant. Fourteen of the photographs depict the internal injuries inflicted on the infant's skull, brain, and optic nerves.

To depict the nature and severity of the injuries, the medical examiner[3] removed the skin from the top and back of the infant's head, then removed the top of the skull, then removed the brain, and then removed the eyes and optic nerves. The photographs to which Appellant objected depict the skull with fractures and blood clots; the skull base with blood around it; the brain and its surrounding membranes, also with blood around them; and the eyes and optic nerves, which also indicated hemorrhaging.

Appellant objected to these 14 photographs, arguing that their prejudicial effect unfairly outweighed their probative value. The trial court denied the objections and admitted the photographs. Lopez testified about what the pictures showed from a medical standpoint and how the injuries sustained were indicative of acute, blunt-force trauma. She testified that the injuries to the infant's brain were significant and ultimately led to her death.

---

[3] To be clear, the medical examiner that performed the autopsy was not the same medical examiner that testified at trial. This distinction is not pertinent to our analysis of any of the issues on appeal, however.

**Motion to Suppress**

In his first issue, Appellant argues the trial court abused its discretion by denying his motion to suppress.

**A.     Standard of Review**

We review a trial court's denial of a motion to suppress evidence under a bifurcated standard of review. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). We give almost total deference to a trial court's determination of historical facts, especially if those determinations turn on witness credibility or demeanor, and we review de novo the trial court's application of the law to facts not based on an evaluation of credibility and demeanor. *Gonzales v. State*, 369 S.W.3d 851, 854 (Tex. Crim. App. 2012). At a suppression hearing, the trial court is the sole and exclusive trier of fact and judge of the witnesses' credibility, and it may choose to believe or disbelieve all or any part of the witnesses' testimony. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).

When the trial court enters findings of fact, the appellate court considers all of the evidence in the record and "must determine whether the evidence supports those facts by viewing the evidence in favor of the trial court's ruling." *Castro v. State*, 373 S.W.3d 159, 164 (Tex. App.—San Antonio 2012, no pet.) (citing *Keehn v. State*, 279 S.W.3d 330, 334 (Tex. Crim. App. 2009)). Additionally, an appellate

court must "uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case." *State v. Iduarte*, 268 S.W.3d 544, 548 (Tex. Crim. App. 2008).

## B.    Analysis

Lieutenant Chandler and Sergeant Figueroa first encountered Appellant at the hospital when the medical staff was attempting to revive Appellant's daughter. They spoke with Appellant for about 30 minutes, until Appellant agreed to go with them to his apartment. Appellant allowed them to search his apartment. Afterwards, Appellant agreed to go with the officers to the police station. Lieutenant Chandler drove him to the police station. While there, police photographed Appellant. The officers then arrested Appellant and took him to a holding facility.

The next day, Lieutenant Chandler and Sergeant Figueroa removed Appellant from the holding facility, and a patrol officer transported him back to the police station. Appellant spoke with Officer Montoya and agreed to provide a voluntary statement. Their conversation was recorded. Near the beginning of the four-hour conversation, Appellant told Officer Montoya that Sergeant Figueroa had called him a "fucking ho" and had lunged at him as if he were going to strike him. Appellant alleged that Sergeant Figueroa got in his face, saying, "Do you want trouble with me?"

11

Officer Montoya followed this up by asking Appellant if he knew why he was being investigated. Appellant acknowledged that it was because he was the only one with the girls at the time of his daughter's death. Officer Montoya then asked Appellant if he wanted to voluntarily discuss what happened with him. Appellant said yes and discussed another way in which he had cooperated with the investigators to aid the investigation.

During the conversation, Officer Montoya described the process of taking a polygraph test. Officer Montoya talked about people trying and failing to lie and cheat during the test.

> [Montoya]: What- what is the investigator going to say if I say, "Look, so-and-so came to cheat and to do tricks on the- on the test."
>
> [Appellant]: Uh-huh.
>
> [Montoya]: The investigator, he or she is going to imagine the worst, right?
>
> [Appellant]: They will beat him up.
>
> [Montoya]: No, because we already know that people come to cheat and trick or fraud—
>
> [Appellant]: Uh-huh.
>
> [Montoya]: . . . because they're only lying.
>
> [Appellant]: I'm think they- because over there they tell me they wanted to beat me up for not wanting to talk. Can you imagine if someone throws me in there and I get beat up . . . .

12

About three hours into the conversation, Appellant took a polygraph test. As Officer Montoya began the test, Appellant told him, "You're really good people. I have more trust in seeing you than . . . . I'm saying that you're the only trustworthy person that I've seen for a while. That's why I trust you."

Officer Montoya had some difficulty getting Appellant to follow the instructions for the polygraph test. The following exchange occurred:

[Montoya]: I'm going to tell you something and I'm going to say it really sincerely. And ta- don't take it as me scolding you, but take it the right way.

[Appellant]: Okay.

[Montoya]: If the investigat- investigators see this video right now. . . it's enough. It's enough evidence for them to see that you are not co-operating.

[Appellant]: No, I'm just—

[Montoya]: I just need to go out right now and make the call and tell them, he's not co-operating. . .

[Appellant]: Okay.

[Montoya]: . . . and you already know what they're going to do with you.

[Appellant]: Yes.

[Montoya]: Okay?

[Appellant]: I apologize.

[Montoya]: No-no-no. You keep telling me the same thing: "Forgive me. I'm sorry."

13

[Appellant]: Yes.

After a short break, Appellant continued to argue that he had not hurt his infant daughter.

[Appellant]: That's what I did and --

[Montoya]: You want --

[Appellant]: . . . I remember all of that well.

[Montoya]: Okay. Okay.

[Appellant]: I got up, I laid her down --

[Montoya]: Okay, Milton. You want me to go out right now and give them --

[Appellant]: How are you going to tell me that I hit her --

[Montoya]: Wait. Let me talk. Milton.

[Appellant]: . . . if I didn't hit her. Understand me.

[Montoya]: Milton, calm down. Calm down. We're men.

[Appellant]: Yes, but I didn't {unintelligible}.

[Montoya]: We're men. Calm down, Milton. Let me talk. Listen to me. It's very important that I want you to listen to me. It's very important, listen to me. Look, Milton. I go out there right now, and I tell these investigators that you . . . don't care. You don't want to explain anything. Do you know what they are going to imagine about you? That you're an animal. . . .

Shortly after that, Appellant took the polygraph test. After the test, Officer Montoya told Appellant he had failed the test and encouraged Appellant to be honest with him about what had really happened. Over the course of the remaining

14

conversation, Appellant admitted to trying to forcefully feed the baby her bottle and shaking her. Appellant admitted that he threw the baby onto the bed, that the baby hit the headboard in the process, that he saw something red that could have been blood, and that he did not investigate further.

Appellant testified at the hearing on the motion to suppress. During his testimony, he repeated his claims that Sergeant Figueroa had called him a derogatory name and lunged at him as if he were going to punch him. He also claimed that, when Lieutenant Chandler and Sergeant Figueroa transported him from the holding facility to the police station, Sergeant Figueroa slapped him while buckling him in the police car. Appellant argued that the derogatory statement, the threatening gesture, the slap, Officer Montoya's statement that Appellant knew what the investigators were "going to do with" him, and Officer Montoya's statement that the investigators would think Appellant was an animal was enough to overcome his will and render his statement involuntary.

Lieutenant Chandler and Sergeant Figueroa also testified at the hearing. Sergeant Figueroa denied calling Appellant a derogatory name, lunging at him, and slapping him. Lieutenant Chandler denied seeing any of the alleged acts.

The trial court issued findings of fact and conclusions of law. The trial court found Lieutenant Chandler and Sergeant Figueroa credible and Appellant not

15

credible. The trial court determined that the alleged acts by Sergeant Figueroa did not occur and concluded that Appellant's statement was voluntary.

Appellant challenges the trial court's denial of his motion to suppress, but does not address how this Court can conclude the trial court's credibility determinations were wrong. "At a suppression hearing, the trial judge is the sole and exclusive trier of fact and judge of the credibility of the witnesses and their testimony." *Maxwell*, 73 S.W.3d at 281. "Almost total deference is afforded to a trial judge's ruling on mixed questions of law and fact that depend upon an evaluation of credibility and demeanor." *Gonzales*, 369 S.W.3d at 854.

The trial court determined that Sergeant Figueroa did not commit the acts alleged by Appellant based on its determination that Sergeant Figueroa was credible and Appellant was not. Without these acts, there are no grounds to support a conclusion that Appellant's statement was involuntary. We find nothing in the record that indicates the trial court could not have made the credibility determinations that it did.

To the contrary, Appellant indicated repeatedly throughout his statement to Officer Montoya that he wanted to explain what happened, that he wanted to co-operate, and that he trusted Officer Montoya. At the conclusion of their meeting, Appellant referred to Officer Montoya as "brother," and told him, "Thank you for

everything, man." Accordingly, we hold the trial court did not abuse its discretion by denying Appellant's motion to suppress his statement.

We overrule Appellant's first issue.

**Jury Instruction**

In his second issue, Appellant argues he suffered egregious harm when the trial court failed to *sua sponte* include a jury instruction on the voluntariness of his statement.

**A.     Standard of Review**

Appellate courts undertake a two-step process in reviewing allegations of jury charge error. *Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984)). First we determine whether error exists in the charge. *Id.* Second, we determine whether the level of harm stemming from the error requires reversal. *Id.* When, as here, there was no objection to the error, "the error must have been so harmful that the defendant was denied 'a fair and impartial trial,'" known as "actual 'egregious' harm." *Id.* (quoting *Almanza*, 686 S.W.2d at 171).

**B.     Error**

Appellant argues that the trial court was required to include an instruction in the jury charge regarding the voluntariness of his statement. A trial judge has an absolute duty to prepare a jury charge that accurately sets out the law applicable to

17

the case. TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007); *Oursbourn v. State*, 259 S.W.3d 159, 179 (Tex. Crim. App. 2008); *see also Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012) ("The purpose of the trial judge's jury charge is to instruct the jurors on all of the law that is applicable to the case."). When a statute requires an instruction under certain circumstances that are present in a case, the instruction is the "law applicable to the case." *Oursbourn*, 259 S.W.3d at 180 (internal quotations omitted). The trial court must give the instruction for the law applicable to the case regardless of whether it has been specifically requested. *Id.* at 179–81.

A statement of an accused may be used as evidence against him if it appears that it was freely and voluntarily made without compulsion or persuasion. TEX. CODE CRIM. PROC. ANN. art. 38.21 (West 2005). There are multiple statutory provisions that can trigger a right to a jury instruction on the voluntariness of a statement. *See Oursbourn*, 259 S.W.3d at 173–74. In this appeal, Appellant relies on section 6 of article 38.22 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6 (West Supp. 2016).

The procedure for a section 6 challenge is as follows: (1) a party notifies the trial court that there is an issue about the voluntariness of the statement, or the trial court raises the issue *sua sponte*; (2) the trial court holds a hearing outside the presence of the jury; (3) the trial court decides whether the statement was voluntary

18

and makes written findings of fact and conclusions of law in support of the ruling; (4) if the trial court decides that the statement was voluntary, it will be admitted, and evidence pertaining to the voluntariness of the statement may be presented before the jury; (5) if such evidence is offered before the jury, the trial court shall give the jury a voluntariness instruction. *See Oursbourn,* 259 S.W.3d at 175 & n.55.

It is established that the first three steps were followed. It is also established that Appellant's interrogation was admitted at trial and that the trial court did not include the section 6 instruction in the charge. This issue turns, then, on whether evidence pertaining to the voluntariness of Appellant's statement was presented to the jury. *See id.* at 175.

A claim of involuntariness under article 38.22 is broader than federal due process claims for involuntariness. *Id.* at 173. "Claims of involuntariness under Article 38.22 can be, but need not be, predicated on police overreaching, and they could involve the 'sweeping inquiries into the state of mind of a criminal defendant who has confessed'" that are excluded under federal due process claims. *Id.* at 172 (quoting *Colorado v. Connelly*, 479 U.S. 157, 166–67, 107 S. Ct. 515, 521 (1986)).

As indicated, some evidence must be presented to the jury that raises the issue of voluntariness. *Id.* at 176. If this evidence would allow a reasonable jury to find that the statement was involuntary, the instruction must be given to the jury. *Id.* This evidence does not need to exclusively pertain to voluntariness, however. *Id.*

19

Instead, it could "easily be implicated by evidence that would also be relevant for other purposes, and Section 6 does not even require the existence of a factual dispute that might obliquely alert the trial judge to the need for an instruction." *Id.*

In *Vasquez*, the only evidence of involuntariness came from the police interrogation. *Vasquez v. State*, 179 S.W.3d 646, 662 (Tex. App.—Austin 2005), *aff'd*, 225 S.W.3d 541 (Tex. Crim. App. 2007). The allegation of involuntariness was based on police overreaching. *See id.* The evidence showed that the defendant had been subjected to a lengthy (seven-hour) interrogation, that the police used a variety of tactics to prevent the defendant from leaving despite telling him he could, and that the police promised to help him obtain medication for his anger. *Id.* The court held that, while the trial court did not err by denying the motion to suppress, the evidence was sufficient to warrant an instruction to the jury on voluntariness. *Id.* at 662–63.

In *Vardeman*, police interviewed the defendant, who was 17, after a six-year-old girl made an outcry of indecent touching. *Vardeman v. State*, No. 05-06-01253-CR, 2008 WL 256765, at *1 (Tex. App.—Dallas 2008, pet. ref'd) (mem. op., not designated for publication). The interrogation lasted around an hour in a fourteen-by-ten-foot room. *See id.* at *1–*2. During the interrogation, the questioning officer refused to accept the defendant's denials, gave confusing instructions on whether the defendant should leave, and sat close to the defendant in a cramped corner. *Id.* The

20

defendant testified he felt compelled to confess because it was his first time interrogated by police, the police officers were much larger than him, and he was missing school classes. *Id.* at *3. The court held the issue of voluntariness was raised, requiring an instruction to the jury. *Id.* at *4. In reaching this conclusion, the court relied on the defendant's testimony of being afraid, receiving confusing instruction about whether to leave, the cramped conditions, and the officer's proximity during questioning.[4] *Id.*

In *Fuentes*, the defendant was found lying in his bedroom with three puncture wounds. *Fuentes v. State*, No. 01-09-00119-CR, 2009 WL 4359065, at *2 (Tex. App.—Houston [1st Dist.] Dec. 3, 2009, pet. ref'd) (mem. op., not designated for publication). His wife was lying dead next to him. *Id.* The defendant was conscious but unresponsive at the house. *Id.* The defendant was taken to the hospital. *Id.* Around 11 hours later, at 3:00 in the morning, police spoke with the defendant. *Id.* at *3. The defendant was not sedated at the time. *Id.* The interrogation lasted about an hour. *Id.* We held the issue of voluntariness had been raised and the trial court had an absolute duty to include a section 6 instruction in the charge. *Id.* at *13.

---

[4] The fact that the defendant was not provided *Miranda* warnings is mentioned in the opinion but is not used by the court as a basis for finding the issue of voluntariness was raised. *See Vardeman v. State*, No. 05-06-01253-CR, 2008 WL 256765, at *1, *3–*4 (Tex. App.—Dallas 2008, pet. ref'd) (mem. op., not designated for publication).

Here, Appellant's interrogation by Officer Montoya was read to the jury. Near the beginning of the interrogation, Appellant told Officer Montoya that Sergeant Figueroa had called him a "fucking ho," had lunged at him as if he were going to strike him, and had asked Appellant if he wanted trouble. Later during the interrogation, Officer Montoya told Appellant he was going to inform the officers that brought him to the police station that Appellant was not cooperating. One of those officers was the officer that Appellant had identified as lunging at him. Officer Montoya followed this up with "and you already know what they're going to do with you." Appellant responded that he did. Later still, Officer Montoya warned Appellant that, if he told the other officers that Appellant was not cooperating, the officers would view Appellant as an animal.

These statements formed the bulk of Appellant's claim during the motion to suppress hearing that Officer Montoya's statement contained an implicit threat that rendered his subsequent statements involuntary.[5] Appellant told Officer Montoya that Sergeant Figueroa had threatened him the day before. Officer Montoya and

_____

[5] Appellant also asserted during the motion to suppress that Sergeant Figueroa had slapped him that morning on the way to the interrogation. No evidence of this claim was presented to the jury. Likewise, the portion of the conversation between Officer Montoya and Appellant where Appellant identified being beat up as a risk to not cooperating with Officer Montoya was not read to the jury and, accordingly, is not part of our analysis. *See Oursbourn v. State*, 259 S.W.3d 159, 175 & n.55 (Tex. Crim. App. 2008) (requiring evidence of involuntariness to be presented to jury before jury instruction is required).

22

Appellant knew that Sergeant Figueroa had brought Appellant to the station that morning. By telling Appellant that he knew what the other officers were going to do with him and that they would view him as an animal, a jury could have reasonably determined that Officer Montoya knew that Appellant would associate those statements with the officer that had allegedly threatened him the day before and had accompanied him to the police station that morning.

Accordingly, we hold that there was some evidence presented to the jury indicating that an officer lunged at Appellant in a threatening way; that Officer Montoya knew about the threatening behavior; that Officer Montoya threatened Appellant by telling him that Appellant knew "what they're going to do with you" and they would view him as an animal when Officer Montoya told the other officers that Appellant was not cooperating; and that Appellant's admitting to acts that harmed the infant did not occur until after these threats were made.

The State points out that there is evidence in the record indicating that Appellant's statement was voluntary. While Sergeant Figueroa did not testify before the jury and no one else denied his alleged actions before the jury, Appellant's statements during the interrogation about how much he trusted Officer Montoya was read to the jury. The State argues, "Given the totality of the circumstances, a reasonable jury would not find that [Sergeant] Figueroa's alleged conduct rendered the defendant unable to make a voluntary statement." There is nothing in the record

23

to establish this as a matter of law. "The question is not whether Appellant 'explicitly' waived his *Miranda* rights, but whether he did so knowingly, intelligently, and voluntarily." *Joseph v. State*, 309 S.W.3d 20, 25 (Tex. Crim. App. 2010); *see also Smith v. State*, 464 S.W.2d 855, 858 (Tex. Crim. App. 1971) (holding evidence of signed statement of voluntariness supported State's proof but not treating evidence as conclusive). The evidence upon which the State relies created a fact issue for the jury to resolve; it did not disprove Appellant's claim of involuntariness as a matter of law. *See Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995) ("Reconciliation of conflicts in the evidence is within the exclusive province of the jury.").

Similarly, the State argues that a jury instruction was not required because what Officer Montoya meant by "and you already know what they're going to do with you" was ambiguous. Any conflict in the meaning of Officer Montoya's statement is a matter for the jury to resolve. *See id.*

Finally, in *Oursbourn*, the Court of Criminal Appeals cited eight cases from the United States Supreme Court where statements were rendered involuntary under federal due process rights. 259 S.W.3d at 170–71 & nn.26–33 (citing *Mincey v. Arizona*, 437 U.S. 385, 98 S. Ct. 2408 (1978); *Greenwald v. Wisconsin*, 390 U.S. 519, 88 S. Ct. 1152 (1968); *Beecher v. Alabama*, 389 U.S. 35, 88 S. Ct. 189 (1967); *Davis v. North Carolina*, 384 U.S. 737, 86 S. Ct. 1761 (1966); *Reck v. Pate*, 367

24

U.S. 433, 81 S. Ct. 1541 (1961); *Culombe v. Connecticut*, 367 U.S. 568, 81 S. Ct. 1860 (1961); *Payne v. Arkansas*, 356 U.S. 560, 78 S. Ct. 844 (1958); *Ashcraft v. Tennessee*, 322 U.S. 143, 64 S. Ct. 921 (1944)).  The State argues that a jury could not have reasonably found Appellant's statement was involuntary based on the facts we have identified because, "[a]s illustrated by [the list of United States Supreme Court cases], the Court of Criminal Appeals has found that the type of police overreaching that renders a statement involuntary involves extreme fact scenarios."  This argument is flawed for two reasons.

First, the federal cases cited are all ones where the court affirmatively held the defendants' statements were not voluntary.  *Mincey*, 437 U.S. at 401–02, 98 S. Ct. at 2418; *Greenwald*, 390 U.S. at 521, 88 S. Ct. at 1154; *Beecher*, 389 U.S. at 38, 88 S. Ct. at 191; *Davis*, 384 U.S. at 752–53, 86 S. Ct. at 1770; *Reck*, 367 U.S. at 444, 81 S. Ct. at 1548; *Culombe*, 367 U.S. at 635, 81 S. Ct. at 1896; *Payne*, 356 U.S. at 567, 78 S. Ct. at 849–80; *Ashcraft*, 322 U.S. at 153, 64 S. Ct. at 926.  These are all examples, then, of when involuntariness is no longer a fact issue.  Here, in contrast, we are tasked with determining whether the minimum quantum of evidence was raised for the matter to be submitted to the jury.  *See Oursbourn*, 259 S.W.3d at 173 (holding that certain factors that "are usually not enough, by themselves, to render a statement inadmissible under Article 38.22, . . . are factors a jury, armed with a proper instruction, is entitled to consider").

25

Second, the Court of Criminal Appeals cited the cases upon which the State relies to illustrate the point that involuntariness under federal due process is *narrower* than involuntariness under article 38.22. *Id.* at 171–72. Whereas federal law considers only an "objective assessment of police behavior" and finds involuntariness only when there has been overreaching by law enforcement, state law considers the defendant's subjective state of mind and can find involuntariness based on the actions of law enforcement, third parties, or even only on the defendant's state of mind. *Id.* While Appellant's claim for involuntariness does involve police overreaching, article 38.22 focuses on the impact of the police actions on Appellant's state of mind, not on an objective assessment of the police actions. *See id.*

We hold evidence pertaining to the voluntariness of Appellant's statement was submitted to the jury. Accordingly, we hold the trial court was required to submit a section 6 instruction on voluntariness to the jury. *See Oursbourn*, 259 S.W.3d at 174.

**C. Harm**

Appellant did not request an instruction on voluntariness. When a defendant does not object, or states that he has no objection to a jury charge, an error will not result in reversal unless the record shows "egregious harm" such that the defendant was denied a fair trial. *See Almanza v. State*, 686 S.W.2d at 171; *see also Warner v.*

26

*State*, 245 S.W.3d 458, 461 (Tex. Crim. App. 2008). Egregious harm exists when the record shows that a defendant has suffered actual, rather than merely theoretical, harm from jury-charge error. *Almanza*, 686 S.W.2d at 174. To meet this standard, the error must be so harmful that it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *Sanchez v. State*, 209 S.W.3d 117, 121 (Tex. Crim. App. 2006). Egregious harm "is present whenever a reviewing court finds that the case for conviction or punishment was actually made clearly and significantly more persuasive by the error." *Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991). We consider the four factors identified in *Almanza*: (1) the entire jury charge, (2) the state of the evidence, (3) the arguments of counsel, and (4) any other relevant information revealed by the record of the trial as a whole. *Almanza*, 686 S.W.2d at 171; *see also Olivas v. State*, 202 S.W.3d 137, 144 (Tex. Crim. App. 2006).

The jury charge does not contain an instruction concerning the voluntariness of Appellant's statement. We find nothing else in the charge that increases or diminishes the impact of this error.

For the state of the evidence, the record establishes that the only people present when the infant died were Appellant and his one-year-old daughter. While this limits the pool of possible culprits, it also establishes that proof of the requisite

27

intent could come only from the nature of the injuries or from Appellant's statement to police.[6]

While the State emphasized both during closing arguments, it placed heavy emphasis on Appellant's statement to police. During closing, the State acknowledged the inclusion of the lesser-included offense of felony-murder,[7] but it emphasized that the jury should find Appellant guilty of capital murder based on the proof that Appellant acted knowingly.

> That is a capital murder case. That he committed this knowingly, and that by the end of the evidence, once you saw those [autopsy] pictures and once you listened to that medical examiner, that you would know that that man was reasonably certain that his conduct would cause her death.

> And how do you know that? You need look no further than the defendant's words himself.

During Appellant's closing argument, his counsel did not ask the jury to acquit Appellant. Instead, he asked the jury to find Appellant guilty of felony-murder, focusing on Appellant's level of intent. In doing so, Appellant's counsel worked to minimize the impact of Appellant's statement.

---

[6] As it applied to Appellant, the State was required to prove that Appellant intentionally or knowingly caused the infant's death. *See* PENAL § 19.02(b)(1).

[7] Conviction for felony-murder as it applied to Appellant, required the State to prove that Appellant intentionally, knowingly, or recklessly caused serious bodily injury to the infant. *See* TEX. PENAL CODE ANN. § 19.02(b)(3), § 22.04(a)(1), (e) (West Supp. 2016).

During the second half of the State's closing argument, the State again began by emphasizing the impact of the autopsy photographs and what they revealed about Appellant's intent. And the State again followed this up by pointing to Appellant's statement.

> And not only can you look at it from the evidence, you can look at it out of the words of the horse's mouth. He told—Officer Montoya asked him: "I give the girl a beating on her head, it's enough." And what does he say? I think the words he used sums it all up: "Of course. You'll kill her, man." It's like a no-brainer. It's not even like "I'm not sure." It's "Of course you'll kill her."
>
> Later on, "I throw her against the wall, head first."
>
> DEFENDANT: "She dies."
>
> He knows.
>
> "Hit her here in front, on top?"
>
> "Her head crown will fall and she'll die."
>
> I don't know how it gets any more plain[], any more simpl[e], that he knew what he was doing would cause her death. And that is your key question, folks. If he intended to or if he knew, then he is guilty of capital murder.

Given the centrality of Appellant's statement to the key issue of his level of knowledge and given the emphasis placed on this evidence in closing arguments, we hold that the error caused Appellant egregious harm.

We sustain Appellant's second issue.

29

## Autopsy Photographs

In his third issue, Appellant argues the trial court abused its discretion by admitting certain autopsy photographs. We are obligated to analyze every issue that is properly raised and that is necessary to final disposition. *See* TEX. R. APP. P. 47.1. This issue cannot provide Appellant with greater relief. Nevertheless, we will address it in the interest of judicial economy. *See Davison v. State*, 405 S.W.3d 682, 691–92 (Tex. Crim. App. 2013) ("[W]hen the proper resolution of the remaining issue is clear, we will sometimes dispose of the case in the name of judicial economy.").

### A. Standard of Review

We review a trial court's rulings on the admissibility of evidence for abuse of discretion. *Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005). A trial court abuses its discretion when its ruling is arbitrary or unreasonable. *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). A trial court does not abuse its discretion if its decision is within "the zone of reasonable disagreement." *Bigon v. State*, 252 S.W.3d 360, 367 (Tex. Crim. App. 2008).

### B. Analysis

In this issue, Appellant challenges the admissibility of 14 autopsy photographs. Rule 403 permits the exclusion of otherwise relevant evidence when its probative value is substantially outweighed by the danger of unfair prejudice.

TEX. R. EVID. 403. When determining the admissibility under rule 403 for autopsy photographs, we consider the following factors: "the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black-and-white, whether they are close-up, whether the body depicted is clothed or naked, the availability of other means of proof, and other circumstances unique to the individual case." *Williams v. State*, 301 S.W.3d 675, 690 (Tex. Crim. App. 2009).

Rule 403 favors the admission of relevant evidence, and it carries the presumption that relevant evidence will be more probative than prejudicial. *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010); *Martinez*, 327 S.W.3d at 737. Further, Rule 403 does not require exclusion of evidence because it creates prejudice; rather, it must be shown that the prejudice is "unfair." *Martinez*, 327 S.W.3d at 737; *Mechler*, 153 S.W.3d at 440. Rule 403 contemplates the exclusion of evidence only when a clear disparity exists between the degree of prejudice of the offered evidence and its probative value. *Davis*, 329 S.W.3d at 806; *Gayton v. State*, 331 S.W.3d 218, 227 (Tex. App.—Austin 2011, pet. ref'd) (citing *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009)).

"Autopsy photographs are generally admissible unless they depict mutilation of the victim caused by the autopsy itself." *Williams*, 301 S.W.3d at 690. However, "[c]hanges rendered by the autopsy process are of minor significance if the

disturbing nature of the photograph is primarily due to the injuries caused by the appellant." *Hayes v. State*, 85 S.W.3d 809, 816 (Tex. Crim. App. 2002).

The infant suffered multiple injuries across her body. Lopez testified, however, that the injuries that most directly lead to the infant's death were the injuries to her skull and, ultimately, her brain. There were some autopsy photographs showing the infant's head with her hair shaved off. These photographs depict some bumps where the internal injuries were located. But they do not otherwise depict the nature or severity of the injuries.

To depict the nature and severity of the injuries, the medical examiner who performed the autopsy removed the skin from the top and back of the infant's head, then removed the top of the skull, then removed the brain, and then removed the eyes and optic nerves. The photographs to which Appellant objected depict the skull with fractures and blood clots; the skull base with blood around it; the brain and its surrounding membranes, also with blood around them; and the eyes and optic nerves, which also indicated hemorrhaging. These are gruesome pictures and were presented to the jury in color on electronic displays.

Ultimately, however, the gruesome nature of these pictures derive mostly from the severity of the injuries. *See id.* (holding alterations of body by autopsy process are of minor significance when disturbing nature of photographs derive primarily from injuries sustained). And the nature of the injuries could only be seen

32

by exposing the skull, brain, and eyes. Since Lopez testified that the head injuries played the primary role in the infant's death, these photographs had particular significance in the jury's determination of guilt. Given their strong probative value, we hold the trial court did not abuse its discretion in determining the photographs' probative value were not unfairly outweighed by their prejudicial effect. *See Mayreis v. State*, 462 S.W.3d 569, 577–78 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (holding images of skull fractures were relevant to prove level of intent and rebut claims of accident).

Appellant also argues that two of the photographs were duplicative of two other photographs. Appellant argues that the duplicates were less probative and outweighed by their prejudicial effect. Each of the photographs that Appellant argues is duplicative is a close up of the same area depicted in another admitted photograph. In each case, the close up pictures provided pertinent detail while the larger-scale pictures showed the injuries in context with the rest of the baby's skull. We hold that the trial court did not abuse its discretion by admitting these photographs. *In re K.Y.*, 273 S.W.3d 703, 711 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (holding injuries "depicted from different angles and levels of closeness, and such comparison can provide the jury with additional information about the injuries").

We overrule Appellant's third issue.

## Conclusion

We reverse the judgment of the trial court and remand for a new trial.

Laura Carter Higley
Justice

Panel consists of Justices Higley, Bland, and Brown.

Publish.  TEX. R. APP. P. 47.2(b).