**Opinion issued February 7, 2019**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-17-00527-CR**

———————————

**STEPHANO CULBREATH, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 119th District Court**
**Tom Green County, Texas**
**Trial Court Case No. B-15-0747-SA\***

---

**MEMORANDUM OPINION**

Following his jury trial and conviction for murder, appellant Stephano

Culbreath challenges the sufficiency of the evidence to support his conviction. He

---

\*   Pursuant to its docket-equalization authority, the Supreme Court of Texas
    transferred this appeal from the Court of Appeals for the Third District of
    Texas to this Court. *See* TEX. GOV'T CODE § 73.001 (authorizing transfer of
    cases). We are unaware of any conflict between precedent of that court and
    that of this court on any relevant issue. *See* TEX. R. APP. P. 41.3.

also contends that the trial court abused its discretion by admitting presumptive-gunshot-residue tests into evidence. Because we conclude that the evidence was sufficient and that the trial court did not abuse its discretion in its evidentiary ruling, we affirm.

## Background

Not long before he was murdered, David Titus asked his ex-girlfriend for some money so that he could pay off a debt. He told her that he might be harmed if he could not come up with the cash. But the ex-girlfriend was conscious of Titus's methamphetamine addiction and the two other loans she had recently given him, so she denied his request. Later that month, around 5:45 AM on July 25, 2015, Titus was riding his bike—his usual mode of transportation after he lost his driver's license—when he was shot and killed in the middle of a street in San Angelo. The bullet entered through the back of his neck, severed his spine, and exited.

About five hours before the shooting, appellant Stephano Culbreath had returned home with his wife in their maroon Chevrolet Suburban. Culbreath sat down on the couch, and his wife went to bed. Sometime within the next hour, Culbreath's wife heard him start their Suburban and leave.

Around 4:00 AM, Culbreath crossed paths with a female acquaintance outside of a convenience store that was about five minutes away from where Titus was later shot. During their brief chat, Culbreath asked if she had seen Titus. She

could tell something was wrong with Culbreath, as if he was ill; he was "shaking, and just, you know, sweating." After finishing their talk, Culbreath got back into his Suburban and left. Sometime during the next hour, Culbreath picked up Berry Baity, another acquaintance. With Baity in the Suburban, Culbreath made his way towards the home of the Mathias sisters, who also were acquaintances.

Meanwhile, one of the Mathias sisters was sitting outside smoking some marijuana when she heard a "pow." Over the fence in her yard, she noticed a man with a bike sitting on a curb. The man jumped on his bike and sped off when she began approaching him. After the man on the bike was out of sight, she heard another shot. About five or ten minutes later, she saw a maroon Suburban pull in front of her house. She made her way to the vehicle to find Baity and Culbreath. She asked if they heard a gunshot. Baity said he did hear something. Culbreath said nothing. The group talked for a few minutes, and then Culbreath left and dropped off Baity at another location. Meanwhile, police were already responding to call that a man and what looked like a bike were lying in the middle of a street a block away from the Mathias sisters' home.

The first officer to respond to the scene noticed that there was little vehicle traffic on the street and surrounding area, a fact the officer found unsurprising given the early-morning hour and his experience patrolling the area. The officer called for backup and began examining the area. He noticed that the bike's rear tire

was flat and that it looked like some reddish paint had rubbed on to the tire. The officer could not find the murder weapon, but he did find a spent .380-calibre cartridge and packet of cigarillos that contained some marijuana.

By 7:00 AM, the street was taped off and filled with police. Detectives were canvasing the area, knocking on nearby residents' doors and asking if they knew what had happened. While the police were beginning their investigation, Culbreath entered a nearby game room, where he ran into a woman he knew. After about an hour, the woman asked Culbreath for a ride home. On their way to her house, Culbreath drove near the crime scene. One of the detectives canvasing the area noticed the maroon Suburban heading in his direction. When the detective spotted the vehicle, it abruptly slowed down, swerved slightly to left, and then the right. To the detective, it seemed like the driver was unsure of whether to turn around or continue in the same direction. The detective watched the vehicle slowly drive by. The driver was sweating "profusely," and as soon as his eyes locked with the detective's, he looked away, slouched into the seat, and continued driving. The detective recorded the vehicle's license plate and passed the number on to the sergeant overseeing the crime scene. Police quickly identified the vehicle's driver as Culbreath and sent a couple of officers to his house.

By the time police were knocking on his door, Culbreath had already brought the woman from the game room back to her residence and met up with

4

another acquaintance, Rockcil Beasley, who followed him back to his house where he dropped off the Suburban before leaving again with Beasley in her car. Culbreath's wife, who had just watched Culbreath run inside, throw the keys on the counter, grab a packet of cigarillos, and leave without saying a word, answered the officers' knocks at the door. She allowed them to search the house for Culbreath, but they found nothing. The officers turned their attention to the maroon Suburban parked out front. They noticed that the vehicle had what appeared to be white and red paint-transfer marks on its bumper, nineteen to twenty-three inches off the ground.

After driving around for a while, Culbreath asked Beasley to drive him back to his house. When they got there, his house was swarming with police. After seeing the police, Beasley noticed that Culbreath became paranoid. She then saw Culbreath reach into his pocket and briefly pull out what she later described to detectives as "a black semi-automatic pistol" that "was slightly larger than a Glock." After Culbreath instructed her to drive away from his house, Beasley dropped him off on a side street. Within a couple of hours, Culbreath and Baity were located and arrested.

During the course of their investigation, police conducted a number of tests, including presumptive-gunshot-residue tests on a number of items. As the name suggests, a presumptive test does not definitively establish whether gunshot residue

is in fact present on the tested item; rather, the test is designed to detect the existence of nitrates that are always but not exclusively produced by a discharging firearm. Accordingly, the existence of nitrates on an item shows only that there may be gunshot residue on the item. To determine if gunshot residue is in fact present, the item must be sent to a laboratory for more detailed testing. Police received positive presumptive-test results on the Suburban, Culbreath's shorts, and the back of Baity's jersey that he was wearing while riding in the passenger seat of Culbreath's Suburban the morning of Titus's murder. Subsequent laboratory testing confirmed the existence of gunshot residue on Baity's shirt and on the waistband, pocket, and back of Culbreath's shorts. The laboratory testing for Culbreath's Suburban, however, came back negative.

While waiting in jail, Culbreath called his wife. He explained to her that police found gunshot residue on him because a friend had accidentally discharged a firearm in their kitchen that left a bullet hole in the cabinets. Neither Culbreath's wife nor investigators found a bullet hole in the kitchen.

The State charged Culbreath with murder under Penal Code section 19.02(b). During his jury trial, the State produced a number of exhibits and witnesses substantiating the account described above. One of the State's witnesses testified that he had seen Culbreath deliver drugs to Titus but never saw Titus pay Culbreath any money. Notably, Culbreath objected to the State's offering into

6

evidence the results of the presumptive-gunshot-residue tests on his Suburban. He argued to the trial court that the presumptive tests were irrelevant because the subsequent laboratory test of the Suburban's samples were negative. He argued alternatively that the presumptive tests should be excluded because there was substantial likelihood that the jury would understand the presumptive tests as evidence that gunshot residue was in fact found inside of his car, despite the negative results from the laboratory test. The trial court overruled Culbreath's objection. After an eight-day trial, the jury returned a verdict of guilty. Culbreath appeals.

**Analysis**

Culbreath raises two issues. He first argues that his murder conviction rests on insufficient evidence. He next maintains that the trial court abused its discretion under Rules of Evidence 401 and 403 by admitting the results of the presumptive tests for gunshot residue on his Suburban. We overrule both issues.

## I.    Sufficiency of the evidence

Culbreath argues that the evidence presented at trial was insufficient to support his murder conviction. In assessing a challenge to the sufficiency of the evidence, we identify the essential elements of the charged offense and then ask whether the evidence and reasonable inferences therefrom, viewed in the light most favorable to the conviction, would permit a rational juror to find each element

beyond a reasonable doubt. *Braughton v. State*, ___ S.W.3d ___, ___, No. PD-0907-17, 2018 WL 6626621, at *11 (Tex. Crim. App. Dec. 19, 2018). The State charged Culbreath with murder under section 19.02(b)(1) of the Texas Penal Code. The essential elements of murder under that section are intentionally or knowingly causing the death of another. TEX. PENAL CODE § 19.02(b)(1).

Whether a conviction rests on direct or circumstantial evidence, the sufficiency standard remains unchanged. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). The analysis requires us to keep in mind that the jury is the sole judge of the evidence's weight and credibility, and we presume that the jury resolved any conflicting inferences in favor of the verdict. *Braughton*, ___ S.W.3d at ___, 2018 WL 6626621, at *11. Although this standard mandates great deference to the jury, we do not defer to a jury's conclusions that are based on "mere speculation or factually unsupported inferences or presumptions." *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007).

The evidence reflects the following facts. Culbreath previously delivered methamphetamine to Titus without being paid. Culbreath boasted that many people owed him money. Before his murder, Titus spoke to his ex-girlfriend, told her that he feared for his safety over a monetary debt that he owed, and asked her to borrow money. Culbreath was looking for Titus shortly before the murder. Culbreath was in the area of Titus's murder at a time and place where and when few people were

8

out. Mathias, who lives a block away from where Titus was murdered, testified that she heard gunshots while she was outside her home around the time Titus was shot. Mathias testified that minutes after hearing the last gunshot, Culbreath showed up at her house in his Suburban. Police found gunshot-primer residue on and in Culbreath's shorts. Police also found gunshot-primer residue on the back of Baity's shirt—the shirt Baity was wearing when he was riding in Culbreath's Suburban around the time of the murder. Beasley told police that she saw Culbreath draw a firearm from his pocket a few hours after the murder. Culbreath fabricated an explanation for why gunshot-primer residue was on and in his clothes. Following the murder, Culbreath drove by the crime scene in his Suburban, and after he saw that police noticed his presence, he immediately went to his house and swapped vehicles.

In his sufficiency argument, Culbreath points to some evidence and asks us to draw inferences in a manner contrary to the standard of review. For example, Culbreath acknowledges that gunshot-primer residue was found on and in his shorts, but he notes that expert testimony established that the residue can be transferred from one person to another by simply brushing against each other. He then emphasizes that during his arrest, officers repeatedly made physical contact with him, including reaching into his pockets and touching his pants. Culbreath asks us to infer that the gunshot-primer residue was on him not because he fired a

gun, but because armed officers had inadvertently placed the residue on him when they arrested him. This argument is unavailing. A defense theory that is merely consistent with the evidence does not equate with a conclusion that the evidence as a whole was insufficient to support a criminal conviction. *See Braughton*, ___ S.W.3d at ___, 2018 WL 6626621, at *12 (The credibility of "evidence is solely within the jury's province," the jury is therefore "free to accept or reject the defensive evidence."). And when evidence is subject to two or more permissible views, the view selected by the jury—which, on appeal, is the view most consistent with the verdict—controls. *See id.* at *11. Accordingly, even if we found Culbreath's argument convincing, we cannot reevaluate the weight and credibility of the evidence and substitute our judgment for that of the jury's. *See id.* at *15.

Viewing the evidence in the light most favorable to the verdict and through the lens of a rational jury, we conclude that the cumulative effect of the trial evidence would permit a rational jury to find beyond a reasonable doubt that Culbreath intentionally shot and killed Titus. We therefore overrule his first issue.

## II. Admissibility of presumptive-gunshot-residue tests

Culbreath contends that the results of the presumptive-gunshot-residue tests are irrelevant under Rule of Evidence 401 and, to the extent they are relevant, their probative value is greatly outweighed by the risk of unfair prejudice under Rule 403. We review a trial court's evidentiary ruling for an abuse of discretion.

10

*Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007). "In other words, as long as the trial court's decision was within the zone of reasonable disagreement and was correct under any theory of law applicable to the case, it must be upheld." *Id.*

Rule 401 provides that evidence is relevant if it has any tendency to make a fact of consequence "more or less probable than it would be without the evidence." Rule 403 provides that a trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." We afford trial courts broad discretion in ruling on 403 objections. *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). A trial court conducting a Rule 403 analysis balances the evidence's probative value; the evidence's potential to impress the jury in an irrational or indelible way; the time needed to develop the evidence; and the proponent's need for the evidence. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

Culbreath's evidentiary arguments regarding the presumptive-gunshot-residue tests are unconvincing. Relevant evidence is generally admissible. TEX. R. EVID. 402. And under Rule 403, there is a presumption that relevant evidence is more probative than prejudicial. *Paz v. State*, 548 S.W.3d 778, 795 (Tex. App.—

11

Houston [1st Dist.] 2018, pet ref'd). Culbreath contends that because a presumptive-gunshot-residue test determines only whether gunshot residue *may* be present and because subsequent laboratory testing concluded that there was no gunshot residue on the samples from his Suburban, the positive results of the presumptive-gunshot-residue tests only served to mislead the jury into believing that gunshot residue was in fact found in his vehicle. Had the State offered the results of the presumptive-gunshot-residue tests for the sole purpose of establishing that gunshot residue was found in the Suburban, Culbreath's argument would be stronger. But evidence that tends to rebut a defensive theory is relevant. *See Dennis v. State*, 178 S.W.3d 172, 177–78 (Tex. App.—Houston [1st Dist.] 2005, pet ref'd). The State offered the evidence because a significant part of Culbreath's defensive strategy was attacking the investigative procedures employed by the police.

For example, in his closing argument, Culbreath summarized his defense strategy by repeatedly contending that the police failed to properly investigate this crime, that they failed to "challenge" any of their hypotheses, and that they were simply guessing. These presumptive-gunshot-residue tests assisted the State in rebutting that argument. That is, the tests were both relevant and probative. The presumptive tests and subsequent police action showed that the police were investigating the case seriously. When the results from the presumptive tests came

12

back positive, they conducted confirmatory testing. The trial court reasonably could have concluded that the State needed the presumptive tests to rebut Culbreath's theory that the police were indefensibly cavalier in their investigation of Titus's murder. *See, e.g.*, *id.* at 177–78.

Contrary to Culbreath's suggestions, the jury was well aware of the presumptive tests' probative scope. The jury heard expert testimony that the presumptive-gunshot-residue tests did not actually test for gunshot residue, but only for nitrates. The expert continued, explaining that nitrates do exist in gunshot residue but that nitrates can also come from many innocent things, such as hot dogs. In fact, every time the presumptive test's results were discussed in front of the jury—which was done rarely and only in the context of explaining how the tests work or in describing law enforcement's investigative efforts—both Culbreath and the State made it a point to convey to the jury that the tests were merely preliminary, testing only whether gunshot residue *may* be present. Further, the State did not mention the tests in its closing argument.

When the trial court ruled on Culbreath's Rule 403 objection to the presumptive tests, it specifically noted that any risk to the jury was minimal considering the expert's testimony that explicitly described the probative value of the tests. In light of the expert testimony, the purpose for which the presumptive tests were introduced into evidence, and the relatively small amount of trial time

spent discussing the tests, we conclude that the trial court's rulings on Culbreath's Rule 401 and 403 objections were appropriate exercises of its discretion. We overrule issue two.

## Conclusion

We affirm the judgment of the trial court.

Richard Hightower
Justice

Panel consists of Justices Lloyd, Kelly, and Hightower.

Do not publish. TEX. R. APP. P. 47.2(b).